UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THERESA A. PALMISANO, | Civil Action No. 09-03410 (SDW) |
| Plaintiff, | |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | September 23, 2010 |

Before the Court is Plaintiff Theresa A. Palmisano's ("Palmisano") appeal of the Commissioner of Social Security's ("Commissioner") final decision that Plaintiff is not disabled and therefore not eligible for disability insurance benefits under Title II, 42 U.S.C. § 421 *et. seq.*, or Title XVI, 42 U.S.C. §§ 1381-83, of the Social Security Act ("Act"). The central issues are whether Administrative Law Judge Donna A. Krappa ("ALJ") erred in determining (1) that Palmisano did not suffer from a listed impairment, and (2) whether Palmisano had the residual functional capacity to perform her past relevant work. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Venue is proper in this District under 28 U.S.C. § 1391(b). This appeal is decided without oral argument pursuant to Local Civil Rule 9.1(b). For the reasons discussed below, the Court **VACATES** and **REMANDS** the Commissioner's decision.

**FACTUAL AND PROCEDURAL BACKGROUND**

Palmisano applied for disability benefits on September 14, 2004. Her application was denied initially then denied again on reconsideration. On September 26, 2007, the

Administrative Law Judge ("ALJ") issued an unfavorable decision and the Appeals Council denied Plaintiff's request for review.  Thus, Palmisano commenced the present action seeking a disability finding or a remand of his claims to the Commissioner for reconsideration in light of the alleged deficiencies in denying Plaintiff's disabled status.

A.  *Medical Evidence*

Palmisano was born on August 12, 1967 and is currently 43 years old.  (Tr. 287.)  She has a high school education.  (*Id*.)  She last worked in 2003 as a part-time telemarketer 10 hours per week.  The job lasted less than a year before Palmisano was laid off because she could not work full-time.  (*Id*.)  Over the past 15 years the majority of the jobs she held have been part-time and consisted of either telemarketing, clerical or cashier work that involved sitting without any significant lifting or carrying, aside from a brief stint in catering.  (*Id.* 287, 64-75.)  Although Palmisano held full-time jobs in the past, after she had children it was her practice to work only part-time jobs.  (*Id.* 289.)

Between October 15, 2000 and March 10, 2005, Dr. Thomas R. Nucatola diagnosed and treated Palmisano for arthralgia with underlying multiple sclerosis.  During this time she complained of tenderness in her left arm and lower back, and was also fairly stiff with mild weakness and some dysesthesias.  There was weakness in her left side with some visual impairment related to her multiple sclerosis.  (Tr. 207-27.)

Dr. J. Paolino, a Division of Disability Services physician ("DSS physician"), conducted a physical residual functional capacity assessment form ("RFC form") on March 3, 2004.  Dr. Paolino diagnosed Palmisano with multiple sclerosis consistent with her symptoms of fatigue, headache and blurred vision.  Furthermore, he reported that the severity of the symptoms is proportionate to that expected on the basis of the diagnosis and the severity of the symptoms and

the alleged effect on function was consistent with the total medical and non-medical evidence. Dr. Paolino also found that Palmisano had limitations in handling, fingering, and feeling due to tightness and stiffness of the hands. (Tr. 159-66.)  On March 17, 2004 Dr. Schanzer ordered an MRI of the brain to be performed, and the test revealed foci or white matter signal abnormality in a distribution that is consistent with a demyelinating syndrome.  Also, there was a marginally edematous appearing left optic nerve consistent with a history of optic neuritis.  (Tr. 141-58.)

On April 2, 2004 Dr. Merkin diagnosed Palmisano with optic neuritis with loss of vision in her left eye.  Her symptoms were facial numbness, body aches and daily headaches.  An MRI of the cervical spine revealed a small C2 plaque.  Palmisano also complained of exhaustion, facial pain, left arm pain, and numbness in the right hand.  The medications she was taking at the time included Provigil, Pamelor, Mobic, Symmeterel, Solumedrol, Celebrex, Prednisone, Zanaflex and Rebif.  (Tr. 228-39, 240-41.)  A March 17, 2005 MRI ordered by Dr. Merkin showed white matter legions most consistent with demyelinating disease, a small legion of the posterior cervical spinal cord at C2, and bulges in two discs.  (Tr. 240-46.)

Subsequent to the physical RFC assessment, Palmisano was admitted to JFK medical center on April 9, 2004 to April 10, 2004 for optic neuritis.  She reported experiencing multiple bouts of visual disturbances and a sudden inability to see with her left eye.  (Tr. 176-69.)  A lumbar puncture was performed and she was diagnosed with acute optic neuritis and a demyelinating disorder with multiple sclerosis.  An MRI of the orbits confirmed the diagnosis of optic neuritis and revealed a history of cerebrovascular accident and demyelination syndrome. (Tr. 172-202.)

Palmisano was also treated for arthralgia and multiple sclerosis between May 26, 2005 to August 14, 2006 at the Arthritis, Allergy and Immunology Center.  Her symptoms were weak

and tender hands, mild spasms and tenderness in the thoracic paraspinals, fatigue with headaches and hand spasms.  A May 26, 2005 MRI showed increased weakness in the left hand and a new legion on the cervical cord.  (Tr. 247-51.)  On August 17, 2006 Dr. Benjamin Ford reported that Palmisano had complaints with urinary urgency.  She was scheduled to undergo renal ultrasound and urodynamics evaluation of her urinary tract anatomy and function.  (Tr. 252-58.)  On August 21, 2006 Dr. Michael Merkin completed a multiple sclerosis residual functional capacity questionnaire which states that Palmisano was diagnosed with multiple sclerosis through physical examination, MRI testing and abnormal spinal fluid.  She complained of fatigue, depression and numbness, among other things that were consistent with the disease.  (Tr. 259-72.)  On May 11, 2007 Dr. Merkin stated in a letter that Palmisano had remitting-relapsing multiple sclerosis.  The diagnosis involved persistent and unpredictable symptoms that can interfere with the activities of daily life and work.  (Tr. 273.)

*B.  Testimonial Evidence*

In connection with her disability claim, Palmisano testified at the October 23, 2006 hearing before the ALJ as to the symptoms and pain resulting from her multiple sclerosis.  Dr. Martina Fecher testified as a medical expert on behalf of the government that based on her review of the medical evidence Palmisano did not meet a listed impairment and was capable of performing a full range of sedentary work.  (Tr. 281-317.)  Palmisano testified again at a supplemental hearing on July 10, 2007 regarding her frequent urination and other medical problems including daily fatigue and difficulty in functioning.  Mr. Rocco Meola testified on behalf of the government as a vocational expert that Palmisano could return to work, but only for an "understanding" employer in light of her frequent urination problems and likelihood of higher than normal absences.  (Tr. 318-30.)

4

## LEGAL STANDARDS

This Court must affirm the ALJ's decision if the decision is supported by "substantial evidence." 42 U.S.C. § 405(g); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is "more than a mere scintilla" and is generally thought of as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). This court is required to give substantial weight and deference to the ALJ's findings. *Scott v. Astrue*, 297 F. App'x 126, 128 (3d Cir. 2008). However, the evaluation of the presence of substantial evidence is not merely a quantitative evaluation, but a qualitative one, "without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Furthermore, even where substantial evidence is found to exist, this Court may still review the ALJ's decision to determine if it was based upon proper legal standards. *Curtin v. Harris*, 508 F. Supp. 791, 795 (D.N.J. 1981) (holding that an ALJ's undue emphasis on certain record evidence was in error because it was based on an "erroneous legal standard").

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)).

## DISCUSSION

To establish disability under the Social Security Act, Palmisano must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. §

423(d)(1)(A). This physical or mental impairment must be so severe as to render Palmisano "not only unable to do [her] previous work, but [unable], considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy . . ." § 423(d)(2)(A). The Social Security Administration has promulgated a five-step evaluation process to determine whether an individual is entitled to Social Security disability benefits. *See* 20 C.F.R. § 404.1520.

In step one, the ALJ decides whether the claimant is currently engaged in substantial gainful activity. If the claimant is engaged in substantial gainful activity, the claimant is not eligible for disability benefits and the ALJ's inquiry ends. § 404.1520(a). If the claimant is not engaged in such activity, then in step two the ALJ determines whether the claimant is suffering from a severe impairment. If the impairment is not severe, the claimant cannot qualify for disability benefits and the ALJ's inquiry ends. § 404.1520(c). If the impairment is severe, then in step three the ALJ evaluates whether the evidence establishes that the claimant suffers from a listed impairment. § 404.1520(d). If the claimant suffers from a listed impairment, then the claimant is automatically entitled to disability benefits and the ALJ's inquiry ends. *Id*. If the claimant does not suffer such an impairment, then in step four the ALJ reviews whether the claimant retains the "residual functional capacity" to perform his past relevant work. § 404.1520(e). If the claimant can perform their past relevant work, the claimant is not eligible for disability benefits and the ALJ's inquiry ends. *Id*. If claimant cannot perform such work, then in step five the ALJ considers whether work exists in significant numbers in the national economy that the claimant can perform given his medical impairments, age, education, past work experience, and "residual functional capacity." § 404.1520(f). If such work does exist, the claimant is not eligible for disability benefits. *Id*.

On appeal Palmisano argues that the ALJ's determination is not supported by "substantial evidence." The first two steps of the Social Security Administration's five-step evaluation process were found to be satisfied by the ALJ and are not in dispute. This Court must consider if the ALJ improperly evaluated Plaintiff's medical evidence, and whether a listed impairment was met, in addition to whether the ALJ erred as a matter of law in finding that Plaintiff can perform sedentary work.

A.  *Step Three Analysis*

The courts require an ALJ to "fully develop the record and explain his findings at step-three, including an analysis of whether and why each of claimant's impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x. 260, 263 (3d Cir. 2006) (internal quotation marks omitted). The ALJ may accept some parts of the medical evidence and reject other parts, however, he must consider all the evidence and give some reason for discounting the evidence he rejects. *Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983). In evaluating the validity of "statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s)," the SSA directs the ALJ to consider the treatment relationship and the consistency among the opinions. 20 C.F.R. §§ 404.1527(a)(2)-(d)(4).

Palmisano claims that she meets the criteria of Listing 11.09. (Pl.'s Br. 31-35.) Listing 11.09 states:

> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting

> from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

20 C.F.R., Part 404, Appendix 1, 11.09.

The introduction to multiple sclerosis states that:

> The major criteria for evaluating impairment caused by multiple sclerosis are discussed in listing 11.09. Paragraph A provides criteria for evaluating disorganization of motor function and gives reference to 11.04B (11.04B then refers to 11.00C). Paragraph B provides references to other listings for evaluating visual or mental impairments caused by multiple sclerosis. Paragraph C provides criteria for evaluating the impairment of individuals who do not have muscle weakness or other significant disorganization of motor function at rest, but who do develop muscle weakness on activity as a result of fatigue.
>
> Use of the criteria in 11.09C is dependent upon (1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) obtaining evidence that the system has actually become fatigued. The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness.
>
> The criteria in 11.09C deals with motor abnormalities which occur on activity. If the disorganization of motor function is present at rest, paragraph A must be used, taking into account any further increase in muscle weakness resulting from activity.
>
> Sensory abnormalities may occur, particularly involving central visual acuity. The decrease in visual acuity may occur after brief attempts at activity involving near vision, such as reading. This decrease in visual acuity may not persist when the specific activity is terminated, as with rest, but is predictably reproduced with resumption of the activity. The impairment of central visual acuity in these cases should be evaluated under the criteria in listing 2.02, taking into account the fact that the decrease in visual acuity will wax and wane.
>
> Clarification of the evidence regarding central nervous system dysfunction responsible for the symptoms may require supporting technical evidence of functional impairment such as evoked response tests during exercise.

20 C.F.R., Part 404, Appendix 1, E.

The ALJ determined that Palmisano does not have an impairment or combination of impairments that meets or medically equals Listing 11.09.  The ALJ summarily found that Palmisano's "multiple sclerosis does not rise to a level of meeting or equaling medical listing 11.09 given that the record does not demonstrate the required degree of disorganization of motor function, fatigue, muscle weakness, or visual or mental impairment."  (Tr. 16.)  Her discussion and analysis ended there.  Based on this court's review of the record, the only possible support for the ALJ's conclusion comes from the similarly summary statement from Dr. Fechner that plaintiff did not meet the listed impairment in 11.09.  (Tr. 312-16.)  The ALJ's failure to cite to any specific evidence in the record that she uses to support this finding is beyond meaningful review.  *See Stewart*, 714 F.2d at 290.

Neither Dr. Fechner, a non-examining expert, nor the ALJ engaged in any factual analysis under Listing 11.09.  Dr. Fechner alluded to the fact that Palmisano could walk without a cane and perform certain routine tasks.  (Tr. 313.)  However, the treatment record contains contrary evidence of: a diagnosis of multiple sclerosis via brain MRIs and spinal fluid pathology as required by 11.09(C)(1) (Tr. 240-51, 12-202); Palmisano's fatigue and exhaustion diagnosed by Dr. Merkin as being typical of multiple sclerosis as required by 11.09(C)(2) (Tr. 259-72); Dr. Merkin's finding that the pain, fatigue and other symptoms suffered by Palmisano were severe enough to interfere with her attention and concentration as required by 11.09(C)(3) (*Id.*); visual impairment via various medical records and Palmisano's own testimony as required by 11.09(B) (Tr. 141-58, 167-69, 207-27, 240-51, 259-73); testimony from Palmisano regarding her disorganization of motor function as per 11.09(A); and a diagnosis of depression as a result of her multiple sclerosis, which could satisfy 11.09(B)'s mental impairment requirement.

9

Moreover, because the opinion of a claimant's treating physician is entitled to greater weight than non-treating physicians, findings from Palmisano's treating physicians are entitled to more weight than that of Dr. Fechner. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981) ("We note that in his somewhat abbreviated discussion of the evidence relating to the heart condition, the ALJ makes no mention of any medical findings or opinions supporting Cotter's claim. Dr. Corcino's opinion that Cotter could not return to work is entitled to substantial weight because he is Cotter's treating physician."). The ALJ must "fully develop the record and explain his findings" and analyze whether Palmisano's impairments either alone or in combination are not equivalent in severity to one of the listed impairments. *Rivera*, 164 F. App'x at 263. Although the ALJ is free to accept some parts of the medical evidence and reject others, "he must consider all the evidence and give some reason for discounting the evidence he rejects." *Stewart*, 714 F.2d at 290. This court remands this case to the ALJ to reconsider her decision in light of the relevant evidence. *Dobrowolsky*, 606 F.2d at 407 (holding remand is appropriate if "relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits").

B. *Step Four Analysis*

At step four, the ALJ reviews whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. § 404.1520(e). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999) (citing 20 C.F.R. § 404.1545(a)). "In making a residual functional capacity determination, the ALJ must consider all evidence before him. Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220

10

F.3d at 121 (internal citations omitted). A "comprehensive and analytical" explanation by the ALJ is necessary, "so that a reviewing court may know the basis for the decision." *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

Here, the ALJ determined that Palmisano had the RFC to perform the full range of sedentary work, including her past relevant work as a telemarketer and receptionist, as this work does not require the performance of work-related activities precluded by her residual functional capacity. (Tr. 16-18.) The applicable requirements are delineated in 20 C.F.R. 404.1529 and 20 C.F.R. 404.1527. The ALJ's opinion cites to the records and opinions of Plaintiff's treating physicians and those physicians who had reviewed her records. (Tr. 16-18). However, the ALJ found that Palmisano's "medically determinable impairment could reasonably be expected to produce the alleged symptoms, but [her] statements concerning the intensity persistence and limiting effects of these symptoms *are not entirely credible*." (Tr. 17 (emphasis added).) The ALJ offers no specific reason for why Palmisano's complaints of pain are not credible. Evidence in the record also contradicts the ALJ's finding of credibility, such as her medically prescribed course in prescription painkillers and her consistent complaints of pain made to numerous treating medical doctors, on many occasions, over the course of several years. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121. On remand, the ALJ must give an account of this credibility determination. The ALJ's opinion also states that, "[a]lthough the description of the claimaint's symptoms by Dr. Merkin *appear to be supported by the record* . . . his conclusion that they result on a residual functional capacity for a narrow range of sedentary work *is not*." (Tr. 17 (emphasis added).) This ALJ's determination

must be weighed and reconsidered along with the other medical evidence as a whole in light of this remand.  *See Dobrowolsky*, 606 F.2d at 407.

Moreover, the opinion fails to consider evidence contrary to the ALJ's finding.  Specifically, the DDS doctor found that Palmisano's ability to manipulate objects was "limited [by] tightness and stiffness of the hands." (Tr. 162.)  Additionally, the DDS doctor found Palmisano's exertions to be limited by "fatigue, headache blurred vision, numbness, [and] spasms of the hand," and posture to be "limited by the risk of visual abnormalities or episodes of dizziness." (Tr. 160-61.)  Regarding Palmisano's symptoms, the DDS doctor found "[t]he symptoms of fatigue, headache, blurred vision [] attributable to the diagnosis [of] Multiple Sclerosis," "[t]he severity of the [symptoms] [were] proportionate to that expected on the basis of the diagnosis," and "[t]he severity of the symptom and alleged effect on function [were] consistent with the total medical and non-medical evidence." (Tr. 164.)

The ALJ's opinion does not indicate why the conflicting evidence was rejected or merely ignored, and if rejected, does not adequately explain the basis for said rejection.  The ALJ's opinion does not seem to consider this evidence in the determination of Palmisano's residual functional capacity.  Again, without an adequate explanation, this Court is unable to determine the grounds upon which the ALJ rejected this evidence.  Because the ALJ's opinion contains apparent errors and omissions of probative evidence, this Court is unable to determine whether the ALJ's finding is, indeed, supported by substantial evidence.  Accordingly, this matter is remanded to the ALJ to further develop the factual record and to make a sufficiently detailed determination of Palmisano's residual functional capacity.  *See Burnett*, 220 F.3d at 121 (ordering remand where ALJ did not explain why he rejected certain evidence that supported

plaintiff's claim); *Cotter*, 642 F.2d at 707 (ordering remand where ALJ failed "to explain his implicit rejection" of probative medical evidence);

*C. Step Five Analysis*

The ALJ did not reach step five. Since it is necessary for the ALJ to reanalyze steps three and four, she must analyze step five on remand. *Williams v. Apfel*, 98 F.Supp. 2d 625, 632 (E.D.Pa. 2000) (holding that, on remand, the ALJ must alter his step five analysis to incorporate the holding of the Court). Accordingly, Plaintiff can raise any relevant argument regarding step five pending the ALJ's reevaluation of the evidence.

## CONCLUSION

For the reasons stated above, the ALJ's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.


                                                                                                            s/Susan D. Wigenton, U.S.D.J

Orig:       Clerk
Cc:        Parties